J-A24024-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JULIET L. PRATT | : | No. 437 EDA 2024 |

Appeal from the Order Entered January 4, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0002586-2023

BEFORE: LAZARUS, P.J., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:                    **FILED APRIL 8, 2025**

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Delaware County Court of Common Pleas, which granted the motion of Appellee, Juliet L. Pratt, for writ of *habeas corpus* and dismissed the charges against her for false imprisonment, endangering the welfare of a child ("EWOC"), and possessing instruments of crime ("PIC"). We reverse and remand for further proceedings.

In its order granting Appellee's motion for writ of *habeas corpus*, the trial court set forth the following findings of fact:

> 1. On March 8, 2023, [Appellee] was charged with the offenses, False Imprisonment of a Minor/Not a Parent, 18 Pa.C.S. § 2903; [EWOC], 18 Pa.C.S. § 4304; [PIC], 18 Pa.C.S. § 907, Unlawful Restrain[t] of a Minor/Not a Parent, 18 Pa.C.S. § 2902; and Simple Assault, 18 Pa.C.S. § 2701.
>
> 2. On May 18, 2023, Detective Kevin Knapp testified during the preliminary hearing against [Appellee].

3. Detective Knapp testified he was assigned to investigate an incident involving a school bus driver that occurred on March 8, 2023.

4. Detective Knapp testified the police received a call reporting a child had been "taped-up" on a school bus in Upper Darby Township.

5. Detective Knapp photographed school bus number 41 and retrieved the video recorded on that bus from the Upper Darby School District Transportation Center.

6. Detective Knapp identified clip 6 of the video recorded on bus number 41, on March 8, 2023, at 7:39:02 hours.

7. Clip 6 was played from 7:39:02 hours to 7:40:19 hours.

8. Detective Knapp identified clip 10 of the video recorded on bus number 41, March 8, 2023.

9. Clip 10 was played from 00:00 time to 3:31 on the time display on the video player.

10. Detective Knapp testified he observed in Exhibit "C-2" [Appellee] place something in the trash can.

11. Detective Knapp searched the trash can and found rolled up and ripped duct tape.

12. Detective Knapp testified the bus was equipped with shoulder straps and active seat belts to keep the children in their seats.

13. Detective Knapp contacted the parents of the student identified using the video.

14. Detective Knapp then spoke with [Appellee].

15. Detective Knapp testified [Appellee] said she wrapped the student's feet together with duct tape and taped the shoulder straps.

16. Detective Knapp testified [Appellee] said she removed

the duct tape with a cutting instrument.

17. Detective Knapp testified [Appellee] said she had taped the student once before.

18. Detective Knapp testified the student was ten years of age.

19. On cross-examination, Detective Knapp testified he had been employed with the Upper Darby Township Police Department for five years.

20. Detective Knapp was first a patrolman, and then became a detective.

21. Detective Knapp had been a detective for more than two years.

22. On cross-examination, Detective Knapp testified he believed the bus drivers knew the buses were equipped with video cameras.

23. On cross-examination, Detective Knapp testified the video cameras only record video and not sound.

24. On cross-examination, Detective Knapp testified he took [Appellee] into custody at the Upper Darby School District Transportation Center.

25. [Appellee] was in her car in the parking lot of the Upper Darby School District Transportation Center.

26. On cross-examination, Detective Knapp testified [Appellee] exited her car and he advised [Appellee] she was being taken into custody.

27. She was transported in a patrol car to the police headquarters.

28. On cross-examination, Detective Knapp testified [Appellee] was interviewed at the police headquarters.

29. On cross-examination, Detective Knapp testified he read [Appellee] her rights before she gave a statement.

30. On cross-examination, Detective Knapp testified [Appellee] said she duct taped the student's ankles because he was kicking his feet and was having an issue on the bus.

31. On cross-examination, Detective Knapp testified the student had a disability.

32. On cross-examination, Detective Knapp testified the Director of Transportation indicated bus drivers were not allowed to restrain students using duct tape.

33. Apparently, the police investigation did not include a review of the Upper Darby School District written policies since Detective Knapp testified he did not know what those school district policies were regarding student transport safety.

34. On cross-examination, Detective Knapp testified the student sustained no injury.

35. On cross-examination, Detective Knapp testified that, based upon his knowledge, the student did not seek medical treatment.

36. On May 18, 2023, Abibetu Turay testified during the preliminary hearing against [Appellee].

37. Abibetu Turay testified she is the mother of M.G.B. (a "Minor").

38. Abibetu Turay testified M.G.B. is diagnosed with Down Syndrome and a heart condition.

39. Abibetu Turay testified M.G.B. takes the bus to school.

40. Abibetu Turay testified [Appellee] was M.G.B.'s bus driver in March of 2023.

41. Abibetu Turay testified she spoke with [Appellee] to thank her for driving M.G.B.

42. In addition, Abibetu Turay testified she apologized to [Appellee] for an issue on the bus in which M.G.B. refused

to sit while riding the bus, and was kicking the bus.

43. Abibetu Turay testified she signed a paper in which the Upper Darby School District notified her someone it selected would be on the bus assigned to assist M.G.B.

44. Abibetu Turay testified that when she apologized [Appellee] yelled at Abibetu Turay, and as a result Abibetu Turay became afraid for M.G.B.'s safety and contacted his teacher.

45. Abibetu Turay testified the next day, the police notified her there was an incident on the bus.

46. Abibetu Turay testified M.G.B. cannot speak.

47. Abibetu Turay testified she did not give [Appellee] permission to restrain, to discipline, to deal with M.G.B.'s behavior, or to use duct tape to restrain him.

48. Abibetu Turay testified M.G.B. was ten years old on March 8, 2023.

49. On cross-examination, Abibetu Turay testified [Appellee] was M.G.B.'s bus driver when the school year began in August or September of 2022.

50. On cross-examination, Abibetu Turay testified M.G.B. used a car seat with a seat belt on the bus.

51. On cross-examination, Abibetu Turay testified that at times, she put M.G.B. on the bus in the morning and took him off the bus in the evening.

52. On cross-examination, Abibetu Turay testified she thought M.G.B.'s brother put him on the bus on the morning of the incident.

53. Upon conclusion of the preliminary hearing, the Magistrate District Judge held the offenses of False Imprisonment, [EWOC], and [PIC] for trial.

54. The Magistrate District Judge dismissed the offenses of Unlawful Restraint and Simple Assault.

55. On July [12], 2023, [Appellee] filed … Omnibus Motions for Pre-Trial Relief which included this Motion for Writ of *Habeas Corpus* for Discharge, a Motion to Suppress Statements of [Appellee], and a Motion for Leave to File Additional Pre-Trial Motions.

56. On November 29, 2023, a hearing was held upon [Appellee's] Motion for Writ of *Habeas Corpus* for Discharge.

57. The Commonwealth presented the following exhibits:

a. The May 18, 2023 Preliminary Hearing Transcript transcribed by York Stenographic Services, Inc. (Commonwealth Exhibit "A").

b. The video recorded on the bus, Clips 1 through 10 (Commonwealth Exhibit "B").

c. The video interview of [Appellee] (Commonwealth Exhibit "C").

d. Photographs of the bus interior, and single and double shoulder strap safety belts (Commonwealth Exhibit "D"). This [c]ourt takes judicial notice that Commonwealth Exhibit "D" appears to show three single shoulder strap safety belts and five double shoulder strap safety belts.

e. Photograph of the duct tape in the trash can (Commonwealth Exhibit "E").

f. Photograph of the duct tape retrieved by the police from the trash can (Commonwealth Exhibit "F").

g. Photograph of the car seat with shoulder straps and safety belts (Commonwealth Exhibit "G").

58. [Appellee] presented the following exhibits:

a. The May 18, 2023 Preliminary Hearing Transcript transcribed by Media Court Reporting (Defense Exhibit "D-1").

b. The March 18, 2023 Recorded Interview of [Appellee] transcribed by Media Court Reporting (Defense Exhibit "D-2").

59. Contrary to the Commonwealth's argument, this [c]ourt considers all ten clips of video recorded on the bus to be relevant.

60. This [c]ourt [reviewed all] ten clips of video recorded on the bus. [There is no Upper Darby School District aide or other adult person present on bus number 41 other than Appellee during any of the ten clips of video recorded on the bus until the bus reaches the school.]

(Findings of Fact/Conclusions of Law, filed 1/4/24, at ¶¶ 1-60) (internal citations and footnotes omitted).[1]

On January 4, 2024, the trial court granted Appellee's motion for writ of *habeas corpus* and dismissed the charges of false imprisonment, EWOC, and PIC. The Commonwealth timely filed a notice of appeal pursuant to Pa.R.A.P. 311(d) on February 1, 2024.[2] The court did not order the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the Commonwealth filed none.

_____

[1] The trial court goes on to explain what is depicted in the video clips. (**See id.** at ¶ 60). Despite some testimony indicating that the video clips do not have audio, our review of the video clips confirms that they do have audio. The trial court then details the content of the recorded video interview between Appellee and Detective Knapp on March 8, 2023. (**Id.** at ¶ 61). We have reviewed the video clips and transcript of the recorded interview and discuss the relevant portions of same **infra**.

[2] **See** Pa.R.A.P. 311(d) (allowing appeal as of right where Commonwealth certifies in notice of appeal that trial court's order will terminate or substantially handicap prosecution).

The Commonwealth raises one issue for our review:

Whether the trial court erred in granting [Appellee's] motion for *habeas corpus* relief to dismiss the charges where the evidence presented by the Commonwealth unequivocally established a *prima facie* case on the charges of false imprisonment, [EWOC], and [PIC]?

(Commonwealth's Brief at 3).

The Commonwealth argues that the evidence produced at the preliminary hearing and the hearing on Appellee's motion for *habeas corpus*, viewed in the light most favorable to the Commonwealth and accepted as true, demonstrates that the Commonwealth established a *prima facie* case for the charges of false imprisonment, EWOC, and PIC. Regarding false imprisonment, the Commonwealth contends that the court erred in concluding that it failed to establish Appellee's deprivation of M.G.B.'s freedom to leave a particular place. The Commonwealth maintains that the trial court improperly concluded that because M.G.B. required assistance getting on and off the bus, and was a non-verbal child with special needs, that he lacked individual liberty. The Commonwealth insists that the fact that M.G.B.'s mother signed a paper permitting the school to assign someone to assist him on the bus did not mean M.G.B.'s mother consented to Appellee duct taping her son's legs together such that he would be restricted from moving them in the event of an emergency.

The Commonwealth emphasizes that the evidence established that Appellee restrained a non-verbal ten-year-old child with multiple physical and

mental disabilities by duct taping his ankles together and duct taping the seatbelt harness across his chest. The Commonwealth highlights Appellee's statement that she had to cut M.G.B. out of the duct tape upon arriving at the school to free him from the restraints imposed. The Commonwealth avers that this type of restraint "substantially" interfered with M.G.B.'s liberty as required by the statute and completely stripped M.G.B. of any liberty or agency. The Commonwealth further highlights that the video shows M.G.B. entering the bus with assistance; it does not show that M.G.B. was unable to walk at all. The Commonwealth posits that had an emergency occurred, Appellee's actions wholly restrained M.G.B. from helping himself.

Further, the Commonwealth challenges the court's conclusion that the restraint was not "unlawful" because the Commonwealth allegedly failed to present evidence that Appellee acted without justification or excuse. The Commonwealth claims that the court erroneously concluded that Appellee did not demonstrate "consciousness of guilt" because Appellee knew she was likely on camera. The Commonwealth also asserts that the court improperly credited Appellee's statement to police regarding her alleged justification for her actions, where credibility is not an issue for the court to resolve at this stage of the proceedings. In light of the low evidentiary burden at this juncture, the Commonwealth submits that it established the restraint was unlawful, *i.e.*, that it was with force or threats, and was without justification or excuse. The Commonwealth stresses that the video clips depict Appellee's

frustration with M.G.B., and not a safety concern. The Commonwealth further contends that any claim that Appellee's actions were justified is a question to be resolved by the fact-finder at trial.

Regarding the charge of EWOC, the Commonwealth challenges the court's finding that the Commonwealth failed to establish that Appellee knowingly did anything to endanger M.G.B.'s welfare based on Appellee's statement that she duct taped M.G.B. for his own safety. The Commonwealth insists that the video contradicts Appellee's statement. The Commonwealth points out that M.G.B. was not trying to leave his seat or harm himself or others. The Commonwealth proclaims that, viewed in the light most favorable to the Commonwealth and with all inferences in its favor, the evidence showed that Appellee endangered M.G.B.'s welfare by knowingly violating a duty of care. The Commonwealth emphasizes that Appellee was a special needs bus driver, and a fact-finder could reasonably infer by Appellee's actions and her relationship to M.G.B., that Appellee threatened or endangered M.G.B.'s welfare. The Commonwealth reiterates that any claim of justification is a question properly left for trial.

With respect to the PIC charge, the Commonwealth argues that the court improperly decided that Appellee did not use the duct tape in a criminal manner based on the court's conclusions that the Commonwealth failed to present sufficient evidence of false imprisonment or EWOC. For the reasons set forth above regarding false imprisonment and EWOC, the Commonwealth

contends that it presented a *prima facie* case to establish that Appellee used the duct tape for a purpose not manifestly appropriate for its otherwise lawful use. Further, the Commonwealth maintains that using duct tape to restrain a ten-year-old, nonverbal, special needs child is not merely "ill behavior" as the trial court suggests. The Commonwealth concludes that the trial court erred by granting Appellee's motion for writ of *habeas corpus* and dismissing the charges of false imprisonment, EWOC, and PIC, and this Court must reverse. We agree.

"In reviewing a trial court's order granting a defendant's petition for writ of *habeas corpus*, we must generally consider whether the record supports the trial court's findings, and whether the inferences and legal conclusions drawn from those findings are free from error." ***Commonwealth v. Hilliard***, 172 A.3d 5, 10 (Pa.Super. 2017) (internal citations and quotation marks omitted). Further, "the evidentiary sufficiency, or lack thereof, of the Commonwealth's *prima facie* case for a charged crime is a question of law," and the appellate court's review is plenary. ***Commonwealth v. Karetny***, 583 Pa. 514, 528, 880 A.2d 505, 513 (2005).

> The trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial *prima facie* burden to make out the elements of a charged crime. Therefore, we are not bound by the legal determinations of the trial court.

***Commonwealth v. Ouch***, 199 A.3d 918, 923 (Pa.Super. 2018) (internal citations, quotations, and brackets omitted).

- 11 -

The purpose of a preliminary hearing is

> to determine whether the Commonwealth has made out a *prima facie* case for the offenses charged. A *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime….
>
> The Commonwealth establishes a *prima facie* case when it produces evidence that, **if accepted as true**, would warrant the trial judge to allow the case to go to a jury. The Commonwealth need not prove the elements of the crime beyond a reasonable doubt; rather, the *prima facie* standard requires evidence of the existence of each and every element of the crime charged. Moreover, **the weight and credibility of the evidence are not factors at this stage**, and the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense. Inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case.

*Id.* (internal citations, quotations, and indentation omitted) (emphasis in original). *See also* Pa.R.Crim.P. 542(D) (stating: "At the preliminary hearing, the issuing authority shall determine from the evidence presented whether there is a *prima facie* case that (1) an offense has been committed and (2) the defendant has committed it").

Further:

> The use of inferences is a process of reasoning by which a fact or proposition sought to be established is deduced as the logical consequence from the existence of other facts that have been established. The "more-likely-than-not" test, must be applied to assess the reasonableness of inferences relied upon in establishing a *prima facie* case of criminal culpability.

- 12 -

The more-likely-than-not test is the minimum standard—anything less rises no higher than suspicion or conjecture.

**Commonwealth v. Perez**, 666 Pa. 29, 48, 249 A.3d 1092, 1102-03 (2021) (internal citations and quotation marks omitted).

Following a preliminary hearing,

A pre-trial *habeas corpus* motion is the proper means for testing whether the Commonwealth has sufficient evidence to establish a *prima facie* case. To demonstrate that a *prima facie* case exists, the Commonwealth must produce evidence of every material element of the charged offense(s) as well as the defendant's complicity therein. To meet its burden, the Commonwealth may utilize the evidence presented at the preliminary hearing and also may submit additional proof.

**Commonwealth v. Dantzler**, 135 A.3d 1109, 1112 (Pa.Super. 2016) (*en banc*) (internal citations and quotation marks omitted). **See also Commonwealth v. Predmore**, 199 A.3d 925 (Pa.Super. 2018) (*en banc*), *appeal denied*, 652 Pa. 301, 208 A.3d 459 (2019) (reiterating that pretrial motion for writ of *habeas corpus* is appropriate method for defendant to test whether Commonwealth has established *prima facie* case; Commonwealth is entitled to rely on evidence presented at preliminary hearing when responding to pretrial motion for writ of *habeas corpus*).

The Crimes Code defines the offense of false imprisonment,[3] in relevant

_____

[3] When defining the elements of the crimes at issue in this case, both parties and the trial court at times cite to definitions used in the Pennsylvania Suggested Standard Jury Instructions ("SSJI"). Nevertheless, courts are not

*(Footnote Continued Next Page)*

- 13 -

part, as follows:

### § 2903. False imprisonment

\* \* \*

**(b) False imprisonment of a minor where offender is not victim's parent.**—If the victim is a person under 18 years of age, a person who is not the victim's parent commits a felony of the second degree if [she] knowingly restrains another unlawfully so as to interfere substantially with his liberty.

18 Pa.C.S.A. § 2903(b).[4]   "In determining the magnitude of restraint necessary for false imprisonment, this Court has recognized that false imprisonment covers restraints which are less serious than those necessary for the offenses of kidnapping and unlawful restraint."  *In re M.G.*, 916 A.2d 1179, 1181-82 (Pa.Super. 2007) (internal footnotes omitted).[5]   "In determining whether the restraint at issue interfered with [the minor's] liberty 'substantially,' we give the word 'substantially' its plain meaning.  Thus, we

_____

bound to the terms of the SSJI's unless the language used therein is made mandatory in a precedential judicial decision.  *Commonwealth v. H.D.*, 665 Pa. 216, 220 n.1, 247 A.3d 1062, 1064 n.1 (2021).

[4] The Editors' Note to the statute explains that Section 2903 is derived from Section 212.3 of the Model Penal Code.  18 Pa.C.S.A. § 2903, Editors' Note. The Model Penal Code provides: "A person commits a misdemeanor if [she] knowingly restrains another unlawfully so as to interfere substantially with his liberty."  Model Penal Code § 212.3.

[5] The Crimes Code defines unlawful restraint, in relevant part, as follows: "If the victim is a person under 18 years of age, a person who is not the victim's parent commits a felony of the second degree if [she] knowingly: (1) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury[.]"  18 Pa.C.S.A. § 2902(b)(1).

determine the Legislature intended false imprisonment to cover restraints where an individual's liberty is interfered with in an ample or considerable manner." *Id.* at 1182 (internal citations omitted). Further, we note that Section 2903 does not provide a definition of "unlawful" as used in the statute. *See* 18 Pa.C.S.A. § 2903. Black's Law Dictionary, however, defines "unlawful" as, *inter alia*, "[n]ot authorized by law; illegal"; "[c]riminally punishable[.]" Black's Law Dictionary, UNLAWFUL (12th ed. 2024).[6]

---

[6] Relying on the SSJI's, both the Commonwealth and the trial court state that "unlawfully" as used in Section 2903 means the restraint is "by force or threat without justification or excuse." (The Commonwealth's Brief at 20; Trial Court Opinion at ¶ 68(b)(ii)). We note that Appellee does not utilize this definition in her appellate brief.

Specifically, the SSJI for false imprisonment states:

**15. 2903 False Imprisonment**

1. The defendant has been charged with false imprisonment. To find the defendant guilty of this offense, you must find that each of the following … elements has been proven beyond a reasonable doubt:

*First*, that the defendant restrained *[name of individual]* unlawfully so as to interfere substantially with [his] [her] liberty; and

*Second*, that the defendant did so knowingly. In other words, the defendant was aware that [he] [she] was restraining *[name of individual]* and that the restraint was unlawful and interfered substantially with *[name of individual's]* liberty.

*[Where greater offense is charged:]*

*(Footnote Continued Next Page)*

The Crimes Code defines the offense of EWOC, in relevant part, as follows:

**§ 4304.  Endangering welfare of children**

**(a) Offense defined.**—

(1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if

_____

*Third*, that *[name of individual]* was under 18 years of age at the time of the offense.

[2.  I'll explain some of these requirements:

[An individual is restrained if [he or she is deprived of his or her freedom to leave a particular place] *[give other conditions].*]

[The restraint is unlawful if it is [by force or threats without justification or excuse] *[give other conditions].*]

Pa. SSJI (Crim) 15.2903 (2024) (italics and brackets in original).

The Subcommittee Note also states that "[t]he terms 'unlawfully' and 'knowingly' have the same meaning in false imprisonment under section 2903 as in unlawful restraint under section 2902(a)(1)."  **See id.**, Subcommittee Note.  Interestingly, the SSJI for unlawful restraint instructs that a "restraint is 'unlawful' if it is [by force or threats without **legal** justification or excuse]."  Pa. SSJI (Crim) 15.2902A (2024) (emphasis added) (brackets in original).  Thus, although the Subcommittee Note for false imprisonment indicates that the term "unlawfully" has the same meaning for false imprisonment as it does for unlawful restraint, the SSJI provides different instructions for those crimes where it adds the word "legal" to the instruction for unlawful restraint.  **See id.**

Nevertheless, we have uncovered no Pennsylvania cases that define "unlawfully" for purposes of Section 2903 as "by force or threats without justification or excuse" as stated in the SSJI.  **See H.D., supra**.  We further note that the Crimes Code does not define the term "unlawful" in its general Definitions section.  **See** 18 Pa.C.S.A. § 103.

> [she] knowingly endangers the welfare of a child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304(a)(1). "As used in this subsection, the term 'person supervising the welfare of a child' means a person other than a parent or guardian that provides care, education, training or control of a child." 18 Pa.C.S.A. § 4304(a)(3) (emphasis omitted). Although EWOC generally is graded as a misdemeanor of the first degree, "[i]f the actor engaged in a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree." 18 Pa.C.S.A. § 4304(b)(1)(i-ii).

This Court has developed a three-part test for the Commonwealth to prove an EWOC conviction:

> (1) the accused was aware of his/her duty to protect the child;
>
> (2) the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and
>
> (3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Delamarter*, 302 A.3d 1195, 1201 (Pa.Super. 2023). "[I]n determining what conduct violates the EWOC statute, the common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Id.* at 1206 (internal citations and quotation marks omitted). Further, "[t]he

absence of the infliction of a physical injury to the child … or the uncertainty as to that potential outcome … is immaterial for purposes of our review." ***Id.*** at 1207 (noting EWOC statute's stated concern for psychological welfare of child and that EWOC statute is intended to cover broad range of conduct to safeguard welfare and security of children).

The Crimes Code defines the offense of PIC, in relevant part, as follows:

> **§ 907.  Possessing instruments of crime**
>
> **(a) Criminal instruments generally.**—A person commits a misdemeanor of the first degree if [she] possesses any instrument of crime with intent to employ it criminally.

18 Pa.C.S.A. § 907(a).  "Instrument of crime" includes "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have."  18 Pa.C.S.A. § 907(d).

Further, the Crimes Code defines an "intentionally" and a "knowingly" *mens rea* as follows:

> **§ 302. General requirements of culpability**
>
> *       *       *
>
> **(b) Kinds of culpability defined.**—
>
> (1) A person acts intentionally with respect to a material element of an offense when:
>
> (i) if the element involves the nature of [her] conduct or a result thereof, it is [her] conscious object to engage in conduct of that nature or to cause such a result; and
>
> (ii) if the element involves the attendant circumstances, [she] is aware of the existence of such circumstances or [she] believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of [her] conduct or the attendant circumstances, [she] is aware that [her] conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of [her] conduct, [she] is aware that it is practically certain that [her] conduct will cause such a result.

18 Pa.C.S.A. § 302(b)(1-2).

Instantly, our review of the ten video clips taken from the bus on the morning of March 8, 2023 shows the following series of events, in relevant part:  At approximately 7:15:24 a.m., an adult male escorts M.G.B. onto the bus.  The adult male then leaves and Appellee escorts M.G.B. through the aisle to a seat.  Between approximately 7:15:50 a.m. to 7:16:20 a.m., Appellee appears to assist M.G.B. with his car seat shoulder straps and safety belts in the third row bench seat behind the driver seat.  (**See** Commonwealth's Exhibit "B"; Clip 1).  At approximately 7:25:52 a.m., M.G.B.'s leg and foot are extended into the aisle for a moment.  M.G.B. is not seen kicking any other passenger or blocking any passenger's ability to sit on the bus.  At approximately 7:26:42 a.m., M.G.B.'s leg and foot are again extended into the aisle briefly.  At approximately 7:28:58 a.m., Appellee appears to see M.G.B.'s leg and foot and tells him, "keep your feet in."  (**See** Commonwealth's Exhibit "B"; Clip 3).

At approximately 7:29:01 a.m., M.G.B. again extends his leg and foot

into the aisle. M.G.B. is not seen kicking any other passenger or directly blocking any passenger's ability to sit on the bus. Appellee assists another passenger with finding a seat and then moves M.G.B.'s leg and foot into his seat area and yells "keep your feet in." At approximately 7:29:20 a.m., Appellee moves M.G.B. to the first row bench seat across the aisle, to the right of the driver seat. Appellee appears to assist M.G.B. with his car seat shoulder straps and safety belts. At approximately 7:30:33 a.m., Appellee appears to resecure M.G.B. with his car seat shoulder straps and safety belts. At approximately 7:32:25 a.m., there is a thud and Appellee yells to M.G.B. "stop kicking (inaudible) I'm telling your teacher." At approximately 7:32:32 a.m., there is another thud and Appellee yells "stop kicking." At approximately 7:32:44 a.m., Appellee says "I will have to strap your feet down if you keep kicking." At approximately 7:32:47 a.m., there are more audible thuds. At approximately 7:32:48 a.m., Appellee says, "What's that? One more time." At approximately 7:32:54 a.m., there is audible laughing. Appellee says, "Go ahead do it. I will strap your feet together again." (**See** Commonwealth's Exhibit "B"; Clip 4).

Between approximately 7:34:07 a.m. and 7:34:58 a.m., there are more audible thuds. At approximately 7:35:04 a.m., Appellee appears to be interacting with M.G.B. using tape near M.G.B.'s feet. At approximately 7:37:30 a.m., there is another audible thud. At approximately 7:37:43 a.m., Appellee asks M.G.B., "Did you think this is funny?" and yells, "Stop it." At

approximately 7:38:44 a.m., Appellee appears to be interacting with M.G.B. and resecuring M.G.B.'s car seat shoulder straps. Appellee is holding a roll of duct tape. (**See** Commonwealth's Exhibit "B"; Clip 5). Between approximately 7:39:32 a.m. to 7:40:12 a.m., Appellee appears to be using the tape on the upper safety belt area of M.G.B.'s car seat shoulder straps. At approximately 7:40:06 a.m., Appellee states, "I'm not making (inaudible). I'm not doing it" after Appellee appears to have used tape on M.G.B.'s shoulder straps. At approximately 7:41:23, Appellee states, "I don't know why you think this is funny, I don't know." (**See** Commonwealth's Exhibit "B"; Clip 6).

At approximately 7:54:00 a.m., five child passengers exit the bus. M.G.B. and other passengers remain on the bus. At approximately 7:55:01 a.m., Appellee states, "Hey guess (inaudible) then. Now put them back…. This is ridiculous. Amazing. Every time." At approximately 7:58:04 a.m., the bus appears to arrive at its final destination. (**See** Commonwealth's Exhibit "B"; Clip 9). At approximately 8:02:35 a.m., after some other children exited the bus, an adult enters the bus. Appellee engages in conversation with the adult and appears to remove the duct tape from M.G.B. in the presence of the adult. At approximately 8:02:41 a.m., Appellee says to the other adult, "Kicking. I put him over here. He gets out of his seat. He's kicking the bus. I taped his feet together. I don't understand why. …" At approximately 8:03:58 a.m., Appellee appears to throw the duct tape into a trash bin located on the bus. (**See** Commonwealth's Exhibit "B"; Clip 10).

In her recorded video interview with Detective Knapp, Appellee explained that she drove M.G.B. on the bus the year before. Appellee stated that M.G.B. is "spinning, kicking, kicks the bus." (Transcript of Recorded Interview, 3/8/23, at 6). Appellee stated that she previously used toys to distract M.G.B. on the bus and keep him occupied for the ride, but another autistic child passenger did not like the noise so Appellee could no longer use the toys. Appellee stated that she moved M.G.B.'s seat on the morning of the incident because M.G.B. was sticking his foot in the center aisle. Previously, he would kick other passengers while they were getting on the bus. Appellee explained that while she was assisting another child passenger, M.G.B. had his foot in the aisle. Appellee then moved M.G.B. to his original seat in the front of the bus. Appellee said she had moved M.G.B. from that original seat on the morning of the incident so that M.G.B. would not kick the wheel well.

Appellee said that she "told other drivers, [and] talk[ed] to other drivers and other aides. And they all said do what you have to do[.]" (*See id.* at 8). Appellee explained that M.G.B.'s mother was in the process of completing paperwork to have an aide present on the bus to assist M.G.B., but the aide had not yet been assigned for the bus that morning. Appellee admitted that she should not have driven M.G.B. without an aide present. Appellee admitted that she had taped M.G.B.'s ankles together one other time when he was throwing his shoes. Appellee also conceded that, "I mean now that I'm thinking about it, you know—it's like I said. It's not—you know, it's not for

me to do that [meaning using tape on M.G.B.]" (*Id.* at 13). Appellee then stated, "I don't know what else—I don't—I don't know what else I could do at this point as the driver." (*Id.*) Appellee continued, "And like I'm more frustrated because I don't know what to do and I don't know how to have a safe atmosphere for all—all the kids, not just him." (*Id.* at 14). Appellee explained that she taped M.G.B.'s ankles together so that he would stop kicking. Appellee stated, "I mean I will never, ever use duct tape again." (*Id.* at 21). Appellee said she had a seatbelt cutter to cut the tape in the event of an emergency. Appellee stated, "this was past the point of like a last resort." (*Id.* at 23).

In evaluating the evidence presented, regarding the charge of false imprisonment, the trial court stated: "Based upon the foregoing facts and given the age, mental and physical conditions of M.G.B., this [c]ourt cannot infer M.G.B. was able to exercise his own liberty." (Findings of Fact/Conclusions of Law at ¶ 82). The court went on to state: "In addition, this [c]ourt is unable to infer M.G.B. was able to exercise his own liberty where his family consented to his transportation on the school bus equipped with shoulder straps and a seat belt harness, his mother knew someone needed to escort him on the bus, and the school district determined that a person it selected would be on the bus to assist and supervise M.G.B. during his transport." (*Id.* at ¶ 83). Additionally, the court concluded "duct tape was used by [Appellee] to secure M.G.B.'s ankles to prevent injury due to kicking,

and across the seat belt harness release mechanism to secure the seat harness and to prevent M.G.B.'s manipulation of the release mechanism." (*Id.* at ¶ 91). Thus, the trial court found a "lack of *prima facie* evidence in this case, where M.G.B. possessed no individual agency based upon his age and special needs, and, for this reason, was not deprived of his freedom to leave the school bus." (*Id.* at ¶ 93).

The court reiterated that "M.G.B. as a special needs minor lacked the capacity to exercise his own agency, required additional supervision while transported on the bus, and required a special needs car seat with shoulder straps and a seat belt harness to safely secure and transport him on the school bus." (*Id.* at ¶ 94). "Most significantly, [the court found] a lack of *prima facie* evidence in support of the Commonwealth assertion that the restraint of M.G.B. was unlawful where there is no evidence, direct or circumstantial, presented in this record by the Commonwealth to find or infer the restraint was by force or threat, and was without justification of excuse." (*Id.* at ¶ 95). Specifically, the court found that the Commonwealth failed to establish that "the restraint of M.G.B. was unlawful because the Commonwealth did not establish [Appellee's] actions were without justification or excuse." (*Id.* at ¶ 101). The court further concluded there was no evidence of Appellee's criminal *mens rea*. (*Id.* at ¶ 104).

We cannot agree with the trial court's conclusions. Here, it is undisputed that M.G.B. is under 18 years of age. Regarding whether Appellee interfered

substantially with M.G.B.'s liberty, we initially disagree with the trial court's statements that M.G.B. lacked individual liberty or agency merely because he is non-verbal and/or has special needs.[7] The fact that M.G.B.'s mother agreed for an aide to be present on the bus does not change our conclusion.[8] M.G.B.'s mother did not consent for her son to be restrained with duct tape on the bus.

Viewed in the light most favorable to the Commonwealth and with all reasonable inferences in its favor, the evidence demonstrates that Appellee restrained M.G.B.'s liberty in an ample or considerable manner by duct taping his ankles together and duct taping the chest clip of M.G.B.'s seatbelt. **See** 18 Pa.C.S.A. § 2903(b); **In re M.G., supra**. We reject Appellee's assertion that the duct tape merely constituted an "additional" restraint beyond what the car seat employed such that it did not constitute a substantial interference with M.G.B.'s liberty. Duct taping a child's ankles together so that he cannot move his legs freely and duct taping a chest clip so that it cannot be opened without being cut off certainly goes beyond the level of restraint imposed by the car seat mechanisms.[9]

---

[7] By this logic, one could never commit a false imprisonment upon an infant child.

[8] We repeat that the school district agreed to provide an aide to help M.G.B. on the bus, but no aide was present on the date of the incident.

[9] We further reject Appellee's contentions that the level of restraint used here "is no different than had an Aide sat with the child and held their feet and arms still." (Appellee's Brief at 11). It is obvious that an aide could remove
*(Footnote Continued Next Page)*

The Commonwealth also produced evidence from which a jury could reasonably infer that Appellee was "practically certain that [her] conduct [would] cause" a substantial interference with M.G.B.'s liberty, sufficient to establish evidence of the requisite *mens rea*. **See** 18 Pa.C.S.A. §§ 2903(b); 302(b). **See also Ouch, supra**. In other words, the Commonwealth adduced evidence that Appellee was aware her actions would restrain M.G.B.'s liberty in an ample or considerable manner. Obviously, Appellee's purpose was to prevent M.G.B. from kicking or otherwise causing a disturbance on the bus.[10]

_____

their hands from a child without the need of a cutting agent. In the event of an emergency, an aide could help the child; here, M.G.B. would remain helpless in that situation without intervention from Appellee. Likewise, we cannot agree with Appellee's analogy to the limits imposed on a wheelchair on mass transit. (**See id.**) While the federal regulation Appellee cites to limits the movement of **an occupied wheelchair or mobility aid**, that regulation does not restrain the **person's** movement. **See** 49 CFR 38.23(d)(5). We also disagree with Appellee's claim that "[t]he twenty minutes of restricting movement of legs to prevent kicking and arms to prevent tape removal is no less of an impairment of movement than detaining a person suspected of shoplifting[.]" (Appellee's Brief at 19) (internal brackets omitted). We acknowledge the Editors' Note to the false imprisonment statute that states: "It is not intended by this section to penalize every detention which might be the basis of a civil suit for false imprisonment. For example, a short detention of a suspected thief by the victim for the purpose of questioning or recovering the stolen property would not constitute a crime under this section." 18 Pa.C.S.A. § 2903, Editors' Note. Nevertheless, we cannot agree that restraining a ten-year-old non-verbal child for twenty minutes such that the child cannot move his legs or exit a seat without use of a cutting agent is the same as briefly detaining a suspected shoplifter until police arrive.

[10] To the extent Appellee insists that the Commonwealth also needed to produce evidence to show that Appellee knew her actions were unlawful, as suggested in the SSJI, we reiterate that the SSJI's are not binding in the absence of judicial precedent stating same. **See H.D., supra**. We recognize
*(Footnote Continued Next Page)*

In reaching its decision, the trial court focused on whether Appellee was

_____

that the SSJI utilizes this language based on the Explanatory Note for Sections 212.1-212.5 of the Model Penal Code. Therein, the Explanatory Note for Section 212.3 states that false imprisonment requires knowledge of the unlawful nature of the restraint. **See** Model Penal Code Pt. II, Art. 212, Explanatory Note for Section 212.1-212.5. Although not stated in the SSJI for false imprisonment, the Subcommittee Note for the SSJI for the related crime of unlawful restraint states:

> With regard to the requirement of knowledge dealt with in the second element of subdivision 1, we provide that the defendant's knowledge must extend to (1) the restraint, (2) the unlawfulness of the restraint, and (3) the risk of injury to the individual. We are following the approach taken by the drafters of the Model Penal Code. … *Query* whether the Pennsylvania appellate courts, if confronted with the issue, would construe Crimes code section 2902(a)(1) to require that the defendant's awareness of the "unlawfulness" of his or her conduct extends to the relevant law and its application as well as to factual matters relevant to lawfulness.

Pa. SSJI (Crim) 15.2902A, Subcommittee Note. As we have uncovered no Pennsylvania cases that utilize this language when interpreting the false imprisonment statute, we decline to adopt that suggestion as a mandatory element of false imprisonment here. **See id.**

Moreover, even if Appellee's knowledge of her unlawful actions is an element of false imprisonment, the record here provides evidence of such knowledge. We emphasize that in her recorded interview, Appellee stated: "I mean now that I'm thinking about it, you know—it's like I said. It's not—you know, it's not for me to do that [meaning taping M.G.B.]" (Transcript of Recorded Interview Transcript at 13). We repeat that Appellee also stated: "I mean I will never, ever use duct tape again." (**Id.** at 21). This evidence, if admitted at trial, creates a reasonable inference from which a jury could infer that Appellee knew her actions were unlawful. To the extent the trial court credited other statements by Appellee that demonstrated a lack of consciousness of guilt, it would be up to the fact-finder to weigh those competing pieces of evidence. **See Ouch, supra**.

justified in her actions, using the definition of unlawful as supplied in the SSJI. We agree with the Commonwealth, however, that whether Appellee was justified to act in this manner is a question of fact for trial. *See* 18 Pa.C.S.A. §§ 502 (stating "[i]n any prosecution based on conduct which is justifiable under this chapter, **justification is a defense**") (emphasis added); 503(a) (stating that conduct which actor believes to be necessary to avoid harm or evil to herself or to another is justifiable if (1) harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by law defining offense charged; (2) neither this title nor other law defining offense provides exceptions or defenses dealing with specific situation involved; and (3) legislative purpose to exclude justification claimed does not otherwise plainly appear).[11]   At this juncture of the proceedings, the Commonwealth adduced sufficient evidence to establish a *prima facie* case of false imprisonment. ***See Ouch, supra***.

With respect to the charge of EWOC, the court explained the video

---

[11] Even if we accepted the definition of unlawful as stated by the SSJI, our result would remain the same. Although the court seems to credit Appellee's assertion that her "justification" or "excuse" for duct taping M.G.B. was to protect M.G.B.'s safety and the safety of the other students, the Commonwealth also presented evidence that Appellee appeared frustrated and/or annoyed with M.G.B.'s actions, which may have provided an alternate basis for Appellee's actions. Further, looking to the definition of "unlawful" in the SSJI for the related crime of unlawful restraint, we cannot say that Appellee had a **legal** justification for her actions, even if she believed she was justified in duct taping M.G.B. On this record, the Commonwealth presented sufficient evidence from which a jury could infer that Appellee's actions **lacked** justification or excuse.

shows "a justification for [Appellee's] actions to restrain M.G.B. in order to protect and secure him from unintentional self-harm which may have resulted when he freed himself from the shoulder straps, seat belts, and car seat while the bus was moving, and to protect the other child passengers from tripping over M.G.B.'s legs while the other child passengers entered and exited the bus through its aisle." (Findings of Fact/Conclusions of Law at ¶ 117). The court further stated that based on Appellee's actions of duct taping M.G.B. in the presence of thirteen other child passengers and removing the duct tape in the presence of another adult individual who escorted M.G.B. off the bus, the court could not infer consciousness of guilt on Appellee's part. (*Id.* at ¶¶ 118-19). Thus, the court found a lack of evidence of Appellee's *mens rea*, *i.e.*, "being knowingly aware that M.G.B. was in circumstances that could threaten his physical or psychological welfare, and knowingly failing to act or taking action so lame or meager that such actions could not reasonably be expected to protect M.G.B.'s welfare." (*Id.* at ¶ 120).

Again, we cannot agree with the trial court's conclusions. The trial court again focused on whether Appellee was justified in her actions. As we have explained, however, the question of justification is a defense properly left for trial. *See* 18 Pa.C.S.A. §§ 502; 503. Additionally, the Commonwealth adduced sufficient evidence to show Appellee was aware of her duty to protect M.G.B. as his bus driver. Further, the Commonwealth presented sufficient evidence that Appellee violated her duty of care owed to M.G.B. by duct taping

him in a manner that could threaten his physical safety in the event of an emergency[12] and his psychological welfare by being unable to control his freedom of movement. **See** 18 Pa.C.S.A. § 4304(a)(1); **Delamarter, supra**. Evaluating Appellee's actions under a common sense standard, the Commonwealth presented sufficient evidence that Appellee's actions in duct taping M.G.B. as a form of restraint violated the broad range of conduct the statute seeks to prevent to safeguard the welfare of children. **See id.** The fact that M.G.B. suffered no physical harm as a result of the restraint employed is immaterial. **Id.** The Commonwealth also adduced evidence from which a jury could reasonably infer that Appellee was "practically certain that [her] conduct [would]" endanger M.G.B.'s physical or psychological welfare. **See** 18 Pa.C.S.A. § 4304(a)(1). **See also** 18 Pa.C.S.A. § 302(b). In other words, the Commonwealth adduced sufficient evidence that Appellee was aware her actions in duct taping M.G.B. would cause physical harm to M.G.B. in the event of an emergency or psychological harm to M.G.B., particularly where M.G.B. was non-verbal and might be unable to articulate emotional discomfort. At this stage of the proceedings, the Commonwealth established a *prima facie* case of EWOC.[13] **See Ouch, supra**.

_____

[12] We reiterate that Appellee needed a cutting instrument to free M.G.B. of the restraints once at school.

[13] The Commonwealth charged Appellee with EWOC as an "F3." Based on Appellee's statements that she had previously used duct tape on M.G.B., the
*(Footnote Continued Next Page)*

As to the charge of PIC, the trial court concluded that "the Commonwealth failed to establish *prima facie* evidence for the charge of [PIC] where the Commonwealth has failed to establish *prima facie* evidence to support the underlying offenses of False Imprisonment and [EWOC]." (Findings of Fact/Conclusions of Law at ¶ 123). As we have already decided, the trial court incorrectly determined that the Commonwealth failed to establish a *prima facie* case for false imprisonment and EWOC. Further, we note that the Commonwealth presented evidence that Appellee used the duct tape under circumstances not manifestly appropriate for lawful use. **See** 18 Pa.C.S.A. § 907(d). The Commonwealth also presented evidence that Appellee did so with the intent to employ the duct tape criminally in her commission of the other charged offenses.[14] **See** 18 Pa.C.S.A. § 907(a);

_____

Commonwealth produced sufficient evidence at this stage of the proceedings for "course of conduct" grading. **See** 18 Pa.C.S.A. § 4304(b)(1)(ii).

[14] Appellee's reliance on **Commonwealth v. Foster**, 651 A.2d 163 (Pa.Super. 1994) is misplaced. In **Foster**, the appellant appealed from her judgment of sentence following her conviction for PIC, alleging that the evidence was insufficient to sustain that conviction where her acquittal on homicide charges negated the criminal intent required for PIC. Specifically, the appellant had stabbed her boyfriend but claimed she acted in self-defense. This Court noted that "appellant admittedly possessed a knife which is an instrument commonly used for criminal purposes. However, appellant did not possess the knife with the intent to employ it criminally because she acted in self-defense." **Id.** at 165. This Court continued, "appellant relied on the justification of self-defense and was acquitted of the homicide charges as a result of this defense. Appellant having acted in self-defense did not commit a crime with the knife. A jury could not infer from the killing that appellant possessed the intent to employ the knife criminally." **Id.** at 166. It is clear that **Foster** is procedurally
*(Footnote Continued Next Page)*

302(b)(1)(i). As the trial court's findings as to this charge were based on its erroneous findings regarding the other offenses, and as the record demonstrates sufficient evidence at this stage of the proceedings that Appellee committed PIC, we conclude the trial court erred in granting Appellee's motion for *habeas corpus* relief on this count as well.

In reaching this decision today, we are mindful that it is not an easy job to be a bus driver of children, particularly of those with disabilities. Bus drivers have an enormous responsibility to transport children to and from school safely. It is not difficult to envision a situation wherein a child, with or without any mental or physical disabilities, becomes so disruptive on a school bus that it could potentially create a hazardous situation for the driver or other students. Nevertheless, it is also not difficult to envision that a bus driver might pull the bus over and call for assistance in that scenario rather than duct tape a child in the name of protecting the other students from harm.

Based upon the foregoing, we reverse and remand for further proceedings.

Order reversed. Case remanded for further proceedings. Jurisdiction is relinquished.

---

distinguishable from the facts of this case where **Foster** involved a challenge to the sufficiency of the evidence post-trial rather than a challenge to the Commonwealth's *prima facie* evidence to permit the charges to go forward to trial.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>4/8/2025</u>